## Shechter, Appellant, *v.* Shechter et al.

Argued October 9, 1950. Before DREW, C. J., STERN, STEARNE, JONES, LADNER and CHIDSEY, JJ.

*Donald B. Hirsch,* for appellant.

*Elder W. Marshall,* with him *James R. Orr, Reed, Smith, Shaw & McClay* and *A. S. Fingold,* for appellees.

OPINION BY MR. JUSTICE LADNER, November 20, 1950:

Ruth Shechter filed a bill in equity against her husband, Oscar Shechter, his sister, Sarah Shechter and John Doe, seeking to collect arrearages due for support and reduced to a judgment of $1,983.00 with interest as of September 7, 1945, and also for accumulated arrearages of a support order for the period from September 7, 1945, to August 29, 1946, making the total due as of August 29, 1946, $3,296.00.

The bill was filed September 19, 1946, and its purpose was to reach the assets of a business conducted under the name of Pittsburgh Paper Stock Company which it was charged was established by Shechter and was still owned by him in spite of a colorable attempt to transfer the same to his sister Sarah. Shechter, although claiming to be now a nonresident, and his sister, both appeared and filed answers. The cause proceeded to a hearing and at the conclusion of plaintiff's testimony counsel for the defendants moved the court to dismiss the bill for failure of plaintiff to establish a cause of action, which motion the chancellor granted. Later, after argument of exceptions filed the court en banc upheld the dismissal in a brief general opinion, without any discussion or analysis of the testimony, on the ground that the plaintiff failed to prove Oscar Shechter's ownership of the assets. From that final decree we have this appeal.

The action of the court below was pursuant to Equity Rule 66 under which a dismissal of the bill without hearing defendants' evidence is stated to have the effect of a nonsuit at law. Like a nonsuit at law, therefore, such a decree should only be entered in a clear case where the plaintiff cannot recover under any view

of the evidence with every doubt resolved against its entry and all inferences drawn most favorably to the plaintiff: *Gordon v. Gordon,* 277 Pa. 53, 120 A. 709 (1923) ; *Stinson v. Smith,* 329 Pa. 177, 181, 196 A. 843 (1938). As a general rule unless there are no conflicting inferences to be drawn it is far better to hear the defense so that the appellate court may have the benefit of findings of fact and conclusions of law by the chancellor confirmed by the court en banc.

What the plaintiff here sought to show was a fraudulent transfer by Oscar Shechter of his assets with the design to "hinder, delay and defraud" a creditor. The fact that his wife was that creditor in our opinion is a matter of no consequence. In fact the bitterness engendered by matrimonial differences if anything was more apt to induce a husband to go even farther to defeat his estranged family's claim for support, than in the case of an ordinary creditor. In any event the Statute of 13 Elizabeth Ch. 5, Rob. Dig. 295, 39 P.S. page 262, is undoubtedly applicable here since she is a judgment creditor under the County Court's decree.

Before analyzing the evidence adduced to support the charge it should be remembered that fraud of this nature is never proclaimed from the housetops nor is it done otherwise than surreptitiously with every effort usually made to conceal the truth of what is being done. So fraud can rarely if ever be shown by direct proof. It must necessarily be largely inferred from the surrounding circumstances. As was written by one of the great Chief Justices of this Commonwealth (BLACK) in *Kaine v. Weigley,* 22 Pa. 179, at p. 183-184 (1853), "It is said that fraud must be proved, and is never to be presumed. This proposition can be admitted only in a qualified and very limited sense . . . . It amounts but to this: that a contract, honest and lawful on its face, must be treated as such until it is shown to be otherwise by evidence of some kind, either

positive or circumstantial. It is not true that fraud can *never* be presumed. Presumptions are of two kinds, legal and natural. Allegations of fraud are sometimes supported by one and sometimes by the other, and are seldom, almost never, sustained by that direct and plenary proof which excludes all presumption. A sale of chattels without delivery, or a conveyance of land without consideration, is conclusively presumed to be fraudulent as against creditors, not only without proof of any dishonest intent, but in opposition to the most convincing evidence that the motives and objects of the parties were fair. This is an example of fraud established by a mere presumption of law. A natural presumption is the deduction of one fact from another. For instance: a person deeply indebted, and on the eve of bankruptcy, makes over his property to a near relative, who is known not to have the means of paying for it. From these facts a jury may infer the fact of a fraudulent intent to hinder and delay creditors. A presumption of fraud is thus created, which the party who denies it must repel by clear evidence, or else stand convicted. When creditors are about to be cheated, it is very uncommon for the perpetrators to proclaim their purpose, and call in witnesses to see it done. A resort to presumptive evidence, therefore, becomes absolutely necessary to protect the rights of honest men from this, as from other invasions . . . . It is no hardship upon an honest man to require a reasonable explanation of every suspicious circumstance, and rogues are not entitled to a veto upon the means employed for their detection."

Examining now the facts as gleaned from uncontradicted evidence and drawing the most favorable inference in favor of the plaintiff we find that Oscar Shechter began his waste paper business in 1930 while still in the grocery business and his wife (the plaintiff) assisted him in that business. On October 28,

1931, he filed a fictitious name certificate as sole proprietor of the business known as Pittsburgh Paper Stock Company. He also on December 17, 1934, filed another fictitious name certificate as sole proprietor of a paper shredding business transacted under the name of American Shredding Company. In the meanwhile matrimonial trouble developed. From the record it may fairly be inferred that trouble developed between the defendant Oscar and his wife sometime in 1932. When it actually started is not clear from the testimony. However, there is testimony that he absented himself from his family in October, 1932 (two months before his last child was born). He apparently returned for a while, but on January 3, 1933, he deserted his family permanently.

On June 12, 1933, plaintiff filed a support complaint in the Allegheny County Court, which on June 26, 1933, resulted in a support order. That defendant Shechter was apparently unwilling to discharge his support obligation appears from the record of the Docket Entries of that Court. Within three months attachment proceedings were commenced to enforce the order and from that time some seven or more attachment proceedings were instituted to collect arrearages until the defendant left the jurisdiction. In 1943, he went to California and sought a divorce, but his wife contested the action and the suit was dismissed. Undeterred he went to Nevada in January, 1946, and according to his Answer obtained a divorce decree in that State. From all of which it may be inferred that his bitterness against his wife was such that he sought to evade by every possible means his duty and obligation to support his family.

On March 1, 1932, Oscar Shechter applied for and obtained in this Commonwealth a charter for a corporation under the name of Pittsburgh Paper Stock Company. The capital was $5,000 divided into 500

shares of $10 par value each. The charter application named as incorporators with amount of their respective subscriptions, the following. Morris Shechter, 50 shares (father of defendants), Oscar Shechter, 5 shares, Harry Schilit 25 shares, Sadie Feld, 420 shares. It will be noted that Sarah's name does not appear. Oscar was named treasurer.

The principal and controlling stockholder, Sadie Feld, now Sadie Silver, testified she was employed by Frank and Seder since 1918, and when asked whether she was a stockholder and secretary of the Pittsburgh Paper Stock Company answered she did not know she was, in fact did not know anything about it at all, that she never received any of the stock of that corporation; that she never attended any meetings of its stockholders, never did any work as its secretary, and never knew anything about it; that she never paid any money into the corporation and didn't know of ever having been associated with it, and was merely a friend of Oscar Shechter; that she did not know Harry Schilit or the father Morris Shechter before she met him that day. Asked whether she remembered signing the application for the Charter she answered she didn't remember a thing about it; that she never lived at 5449 Black Street, the address opposite her name in the Charter; that she never subscribed for or undertook to buy 420 shares of stock in said company. She testified that when Oscar Shechter had a little store (that was in 1930) she loaned him $250 but Oscar never told her he would give her stock for the $250; that one day Sarah Shechter brought her the $250 at the store but there was no discussion of the corporation nor was the money paid her for any interest which she was supposed to have in the corporation. Finally she was asked, "Then do I understand that you never consciously, that is to your knowledge, were a stockholder of the company? That is, you never con-

sciously put any money into it as an investment? A. That is correct."

Harry Schilit, another "officer" whose name as President appeared on the signature card by which an account was opened October 5, 1933, at the Union Trust Company, certifying with S. Feld as Secretary, that Oscar Shechter was Treasurer and was the only one authorized to sign checks against the company account, when shown the card, would not admit it was his signature. He said, "I never remember signing anything like that in the bank." "It doesn't look like my signature . . . The S'es look different." He testified he was in the produce business. He denied he ever put any money into the Pittsburgh Paper Stock Company for stock; that 25 shares were given him by Oscar Shechter to whom he had "loaned money a long time ago." He testified also that no meetings of the directors or stockholders were ever held of the corporation of which he was supposed to be president. There were no minutes of any meetings ever kept by the company. He produced the stock certificate of 25 shares, testified it was never called in, never knew the corporation was dissolved, or that an out of existence statement was filed in Harrisburg.

Here we have evidence from which not only the most favorable inference but possibly the only inference was that the corporation was actually nothing but a charter. It had no real existence. Oscar Shechter apparently just used his friends' names as corporators, designated them as officers and directors without meetings and without any money paid by the two principal incorporators who were supposed to have subscribed to 445 out of its 500 shares. Merely obtaining a charter does not automatically establish a corporation in business. Much more is necessary. There must be an organization meeting of the incorporators, the election of directors and officers, acquisition of the

assets, either for stock, or cash as may be directed by the stockholders or the directors pursuant to resolutions duly adopted. Then the customary evidence of the transfer of the assets to this corporation would be by bill of sale, executed by the vendor showing price paid, etc. All of these things are done at meetings of directors and stockholders of which minutes are kept. When therefore there is testimony of two of the principal incorporators that no meetings were held and there were no minutes or records kept, fortified moreover by the fact that the fictitious name certificate of Oscar Shechter as sole proprietor of the business was never revoked or cancelled,* the burden certainly shifted to Oscar and his sister (who claims title through this corporation) to prove the contrary.

Until the defendants prove the facts to be otherwise then we are warranted in believing that title never passed from Shechter to the corporation at all, that the corporation was but a mask, and that the real proprietor of its assets was and always had been Shechter, who named himself as treasurer, who designated at will officers of the corporation, but controlled the funds. According to the testimony of several witnesses who did business with him, he fixed prices, bought and sold the waste paper, etc., hired and discharged employees, negotiated the lease, and ostensibly exercised the same control as he did before.

---

* It was the duty of Shechter to have required the Secretary of the Commonwealth and the Prothonotary to cancel the certificate or make a notation, etc., on the margin of the book: Act of June 20, 1919, P. L. 542, 54 P.S. 25, 26, now supplied by the Act of May 24, 1945, P. L. 967, 54 P.S. 28.7, 28.8. In *Lumber & Millwork Co. etc. v. Bianchi*, 14 D. & C. 261 (1930) it was held failure to cancel or note withdrawal of a member of a firm registered under the fictitious names act rendered him liable to a creditor extending credit on faith of registration.

Even in a regularly organized corporation a chancellor will not be deceived by corporate forms but will "look behind that artificial personality, and if need be, ignore it altogether and deal with the individuals who constitute the corporation." *Kendall v. Klapperthal Co.*, 202 Pa. 596, 607, 52 A. 92 (1902) ; *S. G. V. Co. v. S. G. V. Co.*, 264 Pa. 265, 269, 107 A. 721 (1919). What was there said concerning one man companies applies equally here in the circumstances so far shown.

Even where a bill of sale of assets to a corporation has been shown but the vendor continues to all appearances to occupy the same relation to the property as he did before the attempted transfer, so far as concerns his creditors no title passes to a corporation created by him and they may treat the goods as still belonging to him: *C. Trevor Dunham Inc. v. Van Orsdale*, 82 Pa. Superior Ct. 72 (1923), citing *Lehr, v. Brodbeck*, 192 Pa. 535; *Barlow v. Fox*, 203 Pa. 115; *v. Spicer*, 269 Pa. 451; *Bowersox v. Weigle*, 77 Pa. Superior Ct. 367. And in *Delphia Knitting Mills, Inc. v. Richards*, 62 Pa. Superior Ct. 9 (1915) it was held that where a person owning all the assets of a business, organized a corporation, transferred the business and assets to it, caused the stock of the company to be issued to his wife and thereafter continued in absolute control of the business and assets transferred, the transaction involved a fraud on the creditors.

There was certainly a plentitude of circumstances to show that the corporation was a mere mask behind which Oscar Shechter (who was ostensibly still the actual proprietor) was operating. This, to say the least, cast the burden on him to show the facts to be otherwise.

Equally requiring explanation on her part are the circumstances by which Shechter's sister Sarah now claims to be the owner of the business as successor of the corporation. But first it must be said, of course

if the corporation never in fact acquired title from Shechter and he remained the proprietor, the alleged transfer from the corporation, if it had been made, would avail her nothing. However, even if we assume the corporation had properly acquired title the burden in the circumstances of this case is on her to meet the inferences arising out of the record from the testimony, that after 1937 (the date it is claimed she became the sole owner) her brother still operated, controlled, conducted the business and was generally known to the trade as the proprietor. His name continued to be listed with the same telephone number of the Pittsburgh Paper Stock Company, a listing that was not changed to the name of Sarah until after this Bill in Equity was filed. It is little oversights such as that which frequently point to the truth. Nor can we infer, as the learned counsel for the appellees contends that the dissolution was regular and proper and its assets lawfully transferred, because such inference cannot be drawn in the face of the testimony of Schilit that he knew nothing of any dissolution of the corporation and still held his certificate of stock.

Merely filing an out of existence affidavit does not dissolve a corporation. Nor does the withdrawal of funds of a corporation's bank account by a self-styled officer and a redeposit of the same in another name of itself constitute proof of regularity. Nor did the mere filing by her of a new fictitious name certificate as proprietor of Pittsburgh Paper Stock Co. prove her title in view of the previous registration of Oscar in the name of Pittsburgh Paper Stock Company being still on the records not cancelled.

In short this is clearly a case where the defendants must be required to produce proofs to meet the inferences deducible from the evidence recited. This is no hardship if the transaction was honest as claimed. If

not, then the wrong-doers must expect no protection in a court of equity.

The appellant, in the second question to be argued, charges the court below erred in excluding the record of the testimony of two witnesses who had testified in the County Court in nonsupport proceedings. However, it appears that the only exception filed in this case was a general exception to the entry of the decree dismissing the bill. The exclusion of the record was not made the basis of any exception for a ruling by the court en banc as Equity Rule 69 requires. We cannot consider objections to rulings on evidence under a general exception to a decree.

The decree must be reversed, costs of this appeal to be paid by the appellees, and the record is remanded for further proceedings.